10-1648-cv
Wachovia Bank v. VCG Special Opportunities Master Fund, Ltd.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2010

(Argued:  May 24, 2011                                    Decided: October 28, 2011)

Docket No. 10-1648-cv

_____

WACHOVIA BANK, NATIONAL ASSOCIATION, WACHOVIA CAPITAL
MARKETS LLC,

Plaintiffs-Appellants,

- v. -

VCG SPECIAL OPPORTUNITIES MASTER FUND, LTD., formerly known as
CDO PLUS MASTER FUND LTD.,

Defendant-Appellee.
_____

Before:  KEARSE, POOLER, and LYNCH, Circuit Judges.

Appeal from a judgment of the United States District Court for the Southern District of New York, Laura Taylor Swain, Judge, dismissing complaint that sought an injunction against a FINRA arbitration, and granting defendant's motion to compel arbitration on the ground that defendant, in a credit default swap agreement, was a customer of the entity with which it negotiated part of the agreement but which was a nonparty to the agreement.  See 2010 WL 1222026.

Reversed.

SHAWN PATRICK REGAN, New York, New York (Hunton & Williams, New York, New York, Patrick L. Robson, Hunton & Williams, Charlotte, North Carolina, on the brief), for Plaintiffs-Appellants.

TERENCE W. McCORMICK, New York, New York (Steven G. Mintz, Mintz & Gold, New York, New York, on the brief), for Defendant-Appellee.

KEARSE, Circuit Judge:

Plaintiffs Wachovia Bank, N.A. ("Wachovia Bank" or the "Bank" or "WB"), and Wachovia Capital Markets, LLC (or "WCM"), which formerly were owned by Wachovia Corporation ("Wachovia") and now are wholly-owned subsidiaries of Wells Fargo & Company, appeal from a judgment of the United States District Court for the Southern District of New York, Laura Taylor Swain, Judge, dismissing their action seeking to enjoin an arbitration proceeding brought by defendant VCG Special Opportunities Master Fund, Ltd., formerly known as CDO Plus Master Fund Ltd. (collectively "VCG"), before the Financial Industry Regulatory Authority, Inc. ("FINRA"), against WCM in connection with a credit default swap (or "CDS") transaction between VCG and Wachovia Bank. Plaintiffs asserted that there was no arbitration agreement between VCG and WCM. The district court granted VCG's motion for an order compelling arbitration and dismissed the complaint, ruling that the FINRA Code of Arbitration Procedure for Customer Disputes ("FINRA Code") provides for arbitration of disputes between a FINRA member and its "customer[s]," and that, as WCM was a FINRA member and negotiated part of the CDS agreement entered into by VCG and Wachovia Bank, VCG should be considered a customer of WCM within the meaning of the FINRA Code. On appeal, plaintiffs contend that the district court erred in ruling that VCG was a customer of WCM. For the reasons discussed below, we agree and reverse the judgment.

# I. BACKGROUND

In this dispute as to whether VCG was a "customer" of WCM within the meaning of the FINRA Code with respect to the credit default swap in question, both sides moved for summary judgment. The following facts are drawn largely from the parties' pleadings and their summary judgment filings and, unless otherwise noted, are not in dispute.

## A. The Credit Default Swap Agreement

At the times pertinent to this action, WCM was a registered broker-dealer and a member of FINRA (or of one of its predecessor organizations, see Part II.B. below). Wachovia Bank was a national banking association and not a member of FINRA. VCG was a hedge fund with, by July 2007, more than $58 million in assets under management. VCG was run by a board of directors but had no employees; services were provided to VCG by Vanquish Capital Group LLC ("Vanquish Capital"), whose chief executive and investment officer was VCG board member Donald Uderitz. VCG's investments were managed by Vanquish Advisors LLC ("Vanquish Advisors"), which was principally owned by Uderitz.

In May 2007, Vanquish Capital employee Jonnathan Wong, acting on behalf of VCG, contacted Scott Williams, a WCM employee, to initiate negotiations for a credit default swap agreement between VCG and Wachovia Bank with respect to a collateralized debt obligation ("CDO"), to wit, notes issued by Forge ABS, LLC ("Forge"), an unrelated entity. See generally Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co., 375 F.3d 168, 171-72 (2d Cir. 2004) (a credit default swap, "the most common form of credit derivative, [is a] contract which transfers

- 3 -

credit risk from a protection buyer to a credit protection seller" (internal quotation marks omitted)). The eventual credit default swap agreement between VCG and Wachovia Bank (the "Trade" or "Agreement" or "2007 credit default swap agreement") required the Bank (the protection buyer) to pay a fixed, periodic fee to VCG (the protection seller) over the term of the CDO in exchange for VCG's agreement to make payments to the Bank upon the occurrence of certain events, including a default by Forge on the CDO. VCG was required to deposit $750,000 with Wachovia Bank as collateral security for VCG's obligations.

The Agreement was memorialized in four separate documents. Three dated May 4, 2007, were documents using International Swaps and Derivatives Association ("ISDA") templates, to wit (1) an ISDA Master Agreement that set the general trading terms between the parties to govern their anticipated credit default swap, (2) an ISDA Master Agreement Schedule ("ISDA Schedule") that altered or supplemented the standard ISDA Master Agreement terms to fit the parties' specifications, and (3) a Credit Support Annex to the ISDA Master Agreement ("Credit Support Annex") that provided the terms under which the parties would exchange collateral as part of the credit default swap. The fourth document was a Trade Confirmation dated May 30, 2007 ("Trade Confirmation") that confirmed the specific terms of the parties' Forge credit default swap--which had taken place on May 21, 2007; the Trade Confirmation incorporated by reference the terms of the three previously executed documents. The ISDA Master Agreement provided that all of these Trade documents would constitute a single agreement between VCG and Wachovia Bank.

On behalf of VCG, the terms of the ISDA Master Agreement, the ISDA Schedule, and the Credit Support Annex were negotiated by Vanquish Capital's General Counsel, and those documents were executed by Uderitz. On behalf of Wachovia Bank, the terms of those three

documents were negotiated by Alexis S. Alpert, a Wachovia Bank vice president, who also executed those documents on behalf of the Bank. The Trade Confirmation was executed by Uderitz on behalf of VCG and by Wachovia Bank employee Tracey Bissell on behalf of the Bank. The terms of the Trade Confirmation had been negotiated by Wong on behalf of VCG and by WCM employees Williams, Thomas Edwards, and William McAndrews. Williams and Edwards were directors of WCM's CDO Trading Desk who reported to Sergei Zagin, the head of that Desk; McAndrews was both a director with WCM and an officer of Wachovia Bank; all four had authority to negotiate credit default swaps on behalf of the Bank. Plaintiffs contend that Williams, Edwards, and McAndrews negotiated the terms of the Trade Confirmation on behalf of the Bank. Although VCG refused to admit that those three had negotiated on behalf of the Bank, VCG did not point to evidence calling that contention into serious question. There is no dispute, for example, that "WCM's CDO desk was regularly engaged in trading credit default swaps on CDOs," and that the party "on one side" of "such trades" was "Wachovia Bank." (VCG's Statement of Material Facts Pursuant to Rule 56.1, ¶ 11, in support of its motion for summary judgment; see Plaintiffs' Response to Defendant's Statement of Material Facts ¶ 11, admitting this portion of VCG's ¶ 11 assertion.) Wong, who had initiated discussions for the Forge credit default swap on instructions from Uderitz and another VCG board member, testified in deposition that he had contacted Williams because Williams was a friend he had known prior to working for VCG. Before that call to Williams, Wong had had no interaction with anyone at Wachovia with respect to the credit default swap. Wong knew Williams was employed by Wachovia but did not know by which Wachovia entity. After contacting Williams, Wong dealt principally with Edwards and McAndrews; Wong also did not know which Wachovia entity employed Edwards or McAndrews. Wong testified in part as follows:

> Q. In the course of your employment with Vanquish Capital, do you know whether you ever interacted with Wachovia Capital Markets, LLC?
>
> A. <u>I don't know if I ever interacted with Wachovia Capital Markets, LLC</u>. I was never really sure what entity I was essentially dealing with.
>
> Q. Do you know what entity was the counter party to the CDS trade?
>
> A. From the document, Wachovia Bank.

(Emphasis added.)

Neither Vanquish Capital, which had negotiated the terms of all four Trade documents on behalf of VCG, nor WCM, which had participated in the negotiation of the Trade Confirmation's terms, was a party to the credit default swap or any of the four documents.

The ISDA Master Agreement, which contained a section detailing what "[e]ach party represent[ed] to the other party" (ISDA Master Agreement § 3), was augmented by the ISDA Schedule, which added, <u>inter alia</u>, a "Section[] 3(g)," in which each party disclaimed any reliance on the other party, or on any of the other party's affiliates, in deciding to enter the Trade (the "Disclaimer Clause"):

> (g) **Non-Reliance.** For any Relevant Agreement: . . . [the party] acknowledges that the other party acts only at arm's length and <u>is not its agent, broker, advisor or fiduciary in any respect</u>, and any agency, brokerage, advisory or fiduciary services that the other party (<u>or any of its affiliates</u>) may otherwise provide to the party (<u>or to any of its affiliates</u>) excludes the Relevant Agreement, . . . [that] it is relying solely upon its own evaluation of the Relevant Agreement . . . [and that] it understands the Relevant Agreement and those risks, has determined they are appropriate for it, and willingly assumes those risks, and . . . [that] it has not relied and will not be relying upon any evaluation or advice . . . <u>from the other party, its affiliates or the representatives or advisors of the other party or its affiliates</u> (except representations expressly made in the Relevant Agreement or an opinion of counsel required thereunder).

(ISDA Schedule Part 5(c) (emphases added).) The Disclaimer Clause defined "Relevant Agreement"

to "mean[] this Agreement, each Transaction, each Confirmation, any Credit Support Document, and any agreement (including any amendment, modification, transfer or early termination) between the parties relating to any of the foregoing." (Id.) The ISDA Master Agreement also included a merger clause stating that the agreement "constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto" (ISDA Master Agreement § 9(a)).

B.  VCG's Court Action against Wachovia Bank

In November 2007, after a dispute between the parties had arisen over the extent of VCG's obligation to provide collateral under the Agreement, VCG commenced an action against Wachovia Bank in New York State Supreme Court, alleging, inter alia, fraud, breach of contract, unjust enrichment, and breach of the implied covenant of good faith and fair dealing. WCM was not named as a defendant in that action. Wachovia Bank promptly removed the case to the United States District Court for the Southern District of New York, see CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A., No. 07 Civ. 11078 ("VCG v. WB"), and counterclaimed for breach of contract.

In July 2009, the district court dismissed all of VCG's claims against Wachovia Bank in VCG v. WB except a claim for breach of contract. See 2009 WL 2033048, at *8. In August 2010, the court granted summary judgment in that action in favor of Wachovia Bank, dismissing VCG's breach-of-contract claim and upholding the Bank's breach-of-contract counterclaim. See 2010 WL 3239416, at *5.

C.  The Present Action and the Decision of the District Court

In the meantime, in May 2008, VCG had initiated against WCM the FINRA arbitration that is the subject of the present action.  VCG alleged, inter alia, that WCM had fraudulently induced VCG to enter into the Trade and had breached the FINRA Conduct Rules and its own fiduciary duties.  (See VCG's FINRA Dispute Resolution Statement of Claim at 1-2.)  Wachovia Bank was not named as a respondent in VCG's arbitration claim.

Wachovia Bank and WCM jointly commenced the present action in June 2008, seeking to enjoin the FINRA arbitration on the grounds that the arbitration was duplicative of VCG's lawsuit against Wachovia Bank, which was then still pending in the district court, and that the FINRA arbitration could not proceed because VCG neither had an arbitration agreement with WCM nor was a customer of WCM within the meaning of the FINRA Code, which requires a member to arbitrate disputes in connection with the member's business activities when requested to do so by its "customer."

Following a period of discovery in the present action, the parties filed cross-motions for summary judgment, submitting papers--including excerpts from depositions in VCG v. WB--that disclosed the events described in Part I.A. above.  In an Opinion and Order reported at 2010 WL 1222026, No. 08 Civ. 5655 (S.D.N.Y. Mar. 29, 2010), the district court granted VCG's summary judgment motion and denied the motion of Wachovia Bank and WCM.

The district court ruled that, because Edwards and Williams were employed exclusively by WCM, their role in negotiating the Trade was sufficient to implicate WCM in the deal in a manner that made VCG WCM's customer.  The court stated that

> it is undisputed that Williams and Edwards were employed exclusively by WCM and their duties in that capacity included facilitating the trade as Wachovia Bank's representatives.  While they may well have represented Wachovia Bank, they were clearly performing services for WCM in so doing.  Thus, there is no factual issue as to whether WCM, as an entity, was involved in the transaction. . . .

Here, Williams and Edwards were employees solely of WCM; their interactions with VCG's representatives bring VCG within the broad scope of the term "customer" as used in FINRA Rule 12200. . . . The "business activities" language of FINRA Rule 12200 is again quite broad, excluding only the insurance business activities of a member that is also an insurance company. This insurance carve-out is indicative of the sweep of the rule, and negates any implication that its arbitration mandate is limited to matters arising in traditional brokerage or advisory customer relationships.

2010 WL 1222026, at *4 (first emphasis in original; other emphases added).

The district court rejected plaintiffs' contention that VCG could not be deemed a WCM customer in light of VCG's acknowledgement in the Disclaimer Clause that it had not relied on WCM for advice. The court noted that the FINRA definition of customer provides that that term does not include brokers and dealers, and it stated that the fact that that is the "sole [stated] exclusion suggests that FINRA intended to require its members to arbitrate disputes with the full array of parties with whom they have business dealings, without limiting the scope of the rule to parties who reasonably relied on the FINRA member for impartial advice." Id. at *3. The court concluded that the fact that "VCG could not have reasonably relied on WCM for impartial advice [was] inapposite to the question of VCG's 'customer' status." Id.

The court directed the parties to proceed to FINRA arbitration, id. at *6, and dismissed plaintiffs' complaint. This appeal followed.

II. DISCUSSION

On appeal, Wachovia Bank and WCM contend, inter alia, that given the present record, including VCG's representations in the Disclaimer Clause, the district court should have granted summary judgment in favor of plaintiffs rather than VCG. VCG urges us either to dismiss the appeal on the ground of mootness because plaintiffs have not sought a stay of the district court's decision pending appeal and WCM has participated in the ongoing FINRA arbitration (see VCG brief on

appeal at 16-18), or to affirm on the grounds that because WCM employees were conducting some of the negotiations WCM "induced or shepherded" VCG's investment (id. at 24), and that if there is any ambiguity as to whether VCG was WCM's customer, our decision in John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48 (2d Cir. 2001) ("John Hancock"), requires that the ambiguity "be resolved in favor of arbitration" (VCG brief on appeal at 21). We conclude, given the factual record in this case, that plaintiffs' arguments have merit and that the district court should have granted summary judgment in their favor.

We note first that VCG's contentions as to mootness and the thrust of John Hancock have already been rejected by this Court. As to the former, VCG moved for dismissal of the present appeal on the ground of mootness or for permission to supplement the record; that motion was pending when VCG filed its brief. Its motion was thereafter denied by a panel of this Court, both orally in open court on March 8, 2011, and in a confirming written order entered on March 21, 2011. Accordingly, VCG's present mootness contention is itself moot. As to VCG's assertion that John Hancock requires that FINRA arbitration be ordered notwithstanding any doubts about the scope of an arbitration provision, that contention was advanced by VCG in a similar action involving its participation in a different credit default swap and was rejected. See Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 39 (2d Cir. 2010) ("Citigroup v. VCG").

As for VCG's assertion that WCM induced or shepherded VCG's investment in the credit default swap with Wachovia Bank, we reject that contention because, for the reasons that follow, it is squarely contradicted by the record.

A. Standards of Review

    1. Summary Judgment

We review a district court's decision to grant summary judgment de novo, construing the evidence in the light most favorable to the party against which summary judgment was granted and drawing all reasonable inferences in its favor. See, e.g., Fabozzi v. Lexington Insurance Co., 601 F.3d 88, 90 (2d Cir. 2010). We will affirm the judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).

When each side has moved for summary judgment, the district court in entertaining the motions--and the court of appeals in reviewing the district court's decisions--are required to assess each motion on its own merits and to view the evidence in the light most favorable to the party opposing the motion, drawing all reasonable inferences in favor of that party. See, e.g., United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); White River Amusement Pub, Inc. v. Town of Hartford, 481 F.3d 163, 167 (2d Cir. 2007); Eastman Machine Co. v. United States, 841 F.2d 469, 473 (2d Cir. 1988). Accordingly, in reviewing the district court's grant of summary judgment to VCG, we take the record in the light most favorable to plaintiffs. In reviewing the district court's denial of summary judgment to plaintiffs, we take the record in the light most favorable to VCG.

    2. Arbitration

In the absence of an agreement by the parties to submit the matter of arbitrability to the arbitrator, the question of whether or not a dispute is arbitrable is one for the court. See, e.g., First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995) ("First Options"); Bensadoun v. Jobe-Riat, 316 F.3d 171, 176 (2d Cir. 2003) ("Bensadoun"). This principle "flow[s] inexorably from the fact that arbitration is simply a matter of contract between the parties." First Options, 514 U.S. at 943.

The interpretation of the arbitration rules of an industry self-regulatory organization (or "SRO") such as FINRA is similar to contract interpretation; the organization's arbitration provision "should thus be interpreted 'to give effect to the parties' intent as expressed by the plain language of the provision.'" Bensadoun, 316 F.3d at 176 (quoting John Hancock, 254 F.3d at 58). "The analysis differs from ordinary contract interpretation in that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" Bensadoun, 316 F.3d at 176 (quoting John Hancock, 254 F.3d at 58) (other internal quotation marks omitted). In general, however, terms such as "customer" should be construed in a manner consistent with the "reasonable expectations" of FINRA members. Wheat, First Securities, Inc. v. Green, 993 F.2d 814, 820 (11th Cir. 1993).

"[W]here the District Court is required to determine arbitrability," we have noted, "the summary judgment standard is appropriate." Bensadoun, 316 F.3d at 175. If there is a genuinely disputed factual issue whose resolution is essential to the determination of the applicability of an arbitration provision, a trial as to that issue will be necessary; but where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, we may rule on the basis of that legal issue and "avoid the need for further court proceedings." Id.; see, e.g., UBS Financial Services Inc. v. West Virginia University Hospitals, Inc., --- F.3d ---, No. 11-0235, Slip op. 4345 (2d Cir. Sept. 22, 2011) ("UBS") (affirming dismissal of suit to enjoin FINRA arbitration because, in light of the undisputed facts, the defendants as a matter of law were "customer[s]" of the plaintiffs).


B. The FINRA Code's Meaning of "Customer"

FINRA was created in 2007 through a consolidation of the National Association of Securities Dealers, Inc. ("NASD")--a self-regulatory organization registered under the Securities

- 12 -

Exchange Act of 1934 ("1934 Act")--and the regulatory arm of the New York Stock Exchange Group, Inc. See, e.g., Standard Investment Chartered, Inc. v. National Association of Securities Dealers, Inc., 637 F.3d 112, 114-15 (2d Cir. 2011). FINRA is a registered SRO under the 1934 Act, see 15 U.S.C. §§ 78c(a)(26), 78s(b), and has the authority to, inter alia, create and enforce rules for its members in order to provide "regulatory oversight of all securities firms that do business with the public," Securities and Exchange Commission Release No. 34-56145, 72 Fed.Reg. 42169, 42170 (Aug. 1, 2007).

The FINRA By-Laws define a "'member'" as, inter alia, "any broker or dealer admitted to membership in [FINRA]," FINRA By-Laws art. I(ee); they provide that "'broker'" means an entity that is "engaged in the business of effecting transactions in securities for the account of others, but does not include a bank," id. art. I(e); and that "'dealer'" means an entity that is "engaged in the business of buying and selling securities for [its] own account, through a broker or otherwise, but does not include a bank," id. art. I(k). The Rules set out in the FINRA Code require a member to arbitrate a dispute if

&middot; Arbitration under the Code is either:

    (1) Required by a written agreement, or

    (2) Requested by the customer;

&middot; The dispute is between <u>a customer</u> and a member or associated person of a member; <u>and</u>

&middot; The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

FINRA Rule 12200 (emphases added). The Rules define a "'person associated with a member'" in part as "a natural person engaged in the investment banking or securities business who is directly or

indirectly controlling or controlled by a member." Id. Rule 12100(r)(2). A brokerage-house account representative is such an associated person. See, e.g., John Hancock, 254 F.3d at 51 (sales representative authorized to sell certain life insurance and annuities on behalf of the brokerage firm was an "associated person" under the NASD Rules).

The FINRA Code definition of "customer" states only that "[a] customer shall not include a broker or dealer." FINRA Rule 12100(i). An online FINRA glossary (to which no reference is made in the FINRA Rules) describes a customer as "[a] person or entity (not acting in the capacity of an associated person or member) that transacts business with any member firm and/or associated person." FINRA Glossary of Arbitration Terms, http://www.finra.org/ArbitrationMediation/Glossary/ (last visited October 25, 2011).

Where there is a genuine dispute as to the role played by the FINRA member in connection with a credit default swap, a trial will be required. Thus, in Citigroup v. VCG, VCG entered into a credit default swap with Citibank, N.A. ("Citibank"), a deal that VCG asserted had been recommended to VCG and negotiated by Citigroup Global Markets, Inc. ("CGMI"), a Citibank sister-affiliate that was a member of FINRA; VCG asserted that it had a brokerage services agreement with CGMI and had received advice from CGMI, see 598 F.3d at 33. While this Court affirmed the district court's grant of a preliminary injunction against VCG's attempt to proceed with a FINRA arbitration against CGMI, we noted that there was conflicting evidence in the record raising serious factual questions, warranting a trial as to whether VCG was a "customer" of CGMI within the meaning of FINRA, see 598 F.3d at 32-33, 39.

On the other hand, where the undisputed facts show that the party attempting to proceed with a FINRA arbitration was a customer of the FINRA member, there is no need for further court proceedings. In UBS, in which we noted that the plaintiff "UBS was a FINRA member," Slip

op. at 4348, the undisputed facts showed, inter alia, that the defendants ("WVUH") structured their bond offerings as auction rate securities in accordance with UBS's suggestions and recommendations, see id. at 4348-49, and agreed "to pay UBS a fee for its services in facilitating the auctions at which the bonds were resold and their interest rates set," id. at 4358. We concluded "as a matter of law," id. at 4347, that "[w]ith respect to services UBS rendered in its capacity as a broker-dealer charged with facilitating the ARS auctions, . . . WVUH was UBS's customer under the applicable FINRA rules," id. at 4353; see, e.g., id. at 4358 ("WVUH was UBS's customer because WVUH purchased a service, specifically auction services, from UBS.").

In the present case, the record shows that there was no relationship between VCG and WCM such as the relationship between WVUH and UBS; nor were there any material factual questions such as existed in Citigroup v. VCG. Here, there is no claim that VCG had a brokerage agreement with WCM. Indeed, in response to plaintiffs' statement of undisputed material facts submitted in support of their motion for summary judgment, VCG agreed that "Wong, Vanquish Capital's employee who negotiated the terms of the specific trade, acknowledged that neither Wachovia Bank nor WCM recommended the CDS Trade to VCG." (Plaintiffs' Statement of Material Facts in Support of Their Motion for Summary Judgment ¶ 18; VCG response agreeing with ¶ 18.) Wong acknowledged that this was a major difference between VCG's claim in the present case and VCG's "parallel litigation with Citibank's broker dealer," in which, as Wong testified,

> we asked Citi to recommend something for us that they would transact on. . . . Citi's behavior in this was--case was they actually did recommend a deal. It is not unlike--it is very different than the Forge situation where we went out and said we are accessing [sic] Forge. So this was different. This involved a recommendation from Citi's team.
>
> Q. Just so we are clear, what you are saying is that the deal with Citi was different from the deal with Wachovia because Wachovia did not recommend the deal to VCG?

A. That is correct. I mean, it is a completely different case.

(Plaintiffs' Statement of Material Facts in Support of Their Motion for Summary Judgment ¶ 18; VCG response agreeing with ¶ 18.)

Further, where the parties to the relevant agreements and transactions have expressly disclaimed any sort of advisory, brokerage, or other fiduciary relationship, there is no need to grapple with the precise boundaries of the FINRA meaning of "customer." Here, there is no factual issue as to whether WCM provided advice, recommendations, or other services to VCG, for as noted in Part I.A. above, VCG expressly acknowledged in the Agreement that the Forge credit default swap was an "arm's length" transaction and that neither Wachovia Bank nor "any of its affiliates" had provided VCG or any of VCG's affiliates with "any agency, brokerage, advisory or fiduciary services" with respect to the Forge swap Agreement or any agreement relating to it. (ISDA Schedule Part 5(c).)

On this record, no rational factfinder could infer that VCG was a customer of WCM. Wachovia Bank and WCM were thus entitled to summary judgment in their favor. In light of this conclusion, we need not reach other arguments advanced by plaintiffs.

CONCLUSION

We have considered all of VCG's contentions on this appeal and have found them to be without merit. The judgment of the district court is reversed; the matter is remanded for the entry of judgment in favor of plaintiffs, enjoining VCG from proceeding with its FINRA arbitration against WCM with respect to VCG's 2007 credit default swap agreement with Wachovia Bank.