**SUNTRUST BANKS, INC., and SunTrust Robinson Humphrey, Inc., Plaintiffs,**

v.

**TURNBERRY CAPITAL MANAGEMENT LP, and Turnberry Master, Ltd., Defendants.**

No. 13 Civ. 879 (NRB).

United States District Court, S.D. New York.

May 17, 2013.

Paul A. Strauss, Esq., King & Spaulding LLP, New York, NY, Cory Hohnbaum, Esq., King & Spaulding LLP, Charlotte, NC, for Plaintiffs.

Kevin J. O'Brien, Esq., Alexander Sakin, Esq., Harris, O'Brien, St. Laurent & Houghtel LLP, New York, NY, for Defendants.

### MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

### I. Introduction

On February 6, 2013, plaintiffs SunTrust Banks, Inc. ("SunTrust Banks") and SunTrust Robinson Humphrey, Inc. ("STRH") filed this action against defendants Turnberry Capital Management LP and Turnberry Master, Ltd., seeking to prevent defendants from proceeding with an arbitration they had commenced against plaintiffs before the Financial Industry Regulatory Authority ("FINRA"). Concurrently with the filing of their complaint, plaintiffs moved for a preliminary injunction enjoining the arbitration, and the parties agreed to stay the arbitration pending our decision on plaintiffs' motion. *See* Tr. 3.[1] Following a conference attended by counsel for both plaintiffs and defendants, we issued an Order to Show Cause on February 6 setting a briefing schedule for plaintiffs' motion for a preliminary injunction, though leaving open the date for the hearing on plaintiffs' motion in light of the parties' agreement to stay the arbitration pending our decision. The hearing was held on April 29, 2013, at the beginning of which both sides agreed that it would be proper for us to consolidate the hearing with a resolution of this case on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). *See* Tr. 2–3.

For the reasons stated below, we grant plaintiffs' motion and, pursuant to Rule 65(a)(2), issue a permanent injunction enjoining defendants from pursuing the FINRA arbitration in dispute against plaintiffs.

### II. Background

The arbitration at issue in this case was filed by defendants Turnberry Capital Management LP, a hedge fund, and Turnberry Master, Ltd., the master investment vehicle for the hedge fund, (collectively, "Turnberry" or "defendants") against plaintiffs SunTrust Banks, Inc., a diversified financial services company, and STRH, a subsidiary of SunTrust Banks.[2] *See* FINRA Arbitration Statement of Claim, Ex. 1, O'Brien Decl., ¶¶ 4–5 [hereinafter SOC]. Defendants are also pursuing FINRA arbitration against Raymond James & Associates, Inc. ("Raymond James"), "a broker with which Turnberry had a longstanding relationship." Pennell

---

1. Citations to "Tr." refer to the transcript of the oral argument held on April 29, 2013.

2. STRH was formerly known as SunTrust Capital Markets, Inc., *see* Stathis Decl. ¶ 2,

and the latter is also named as a respondent in defendants' FINRA Arbitration Statement of Claim.

Decl. ¶ 5; *see also* SOC. The only question before us is whether defendants may compel STRH to arbitrate.[3]

### A. Events Preceding Turnberry's Purchase

The events giving rise to this dispute began in early June 2007, when a sales representative from Raymond James informed Turnberry of the opportunity to purchase certificates in a trust entitled the SunTrust Acquisition Closed–Ends Seconds Trust Series 2007–1 (the "Trust"). Pennell Decl. ¶ 5; *see also id.* ¶ 3. The Trust was sponsored by SunTrust Asset Funding, a now-defunct subsidiary of SunTrust Banks. *Id.* ¶ 4; *see also* Stathis Decl. ¶¶ 6–7. The Trust was based on a pool of second-lien residential mortgage loans purchased and aggregated by SunTrust Asset Funding, Pennell Decl. ¶¶ 3–4; *see also* Stathis Decl. ¶¶ 6–7, and "[i]nvestors who [held] certificates in the Trust receive[d] interest and principal payments received from the mortgagees," Stathis Decl. ¶ 6. The initial offering of certificates in the Trust was held on May 15, 2007, and STRH was a co-lead underwriter. Pennell Decl. ¶¶ 3–4; *see also* Stathis Decl. ¶ 5. Not all of the certificates were sold at the initial offering, however, and some of the remaining certificates were subsequently made available through Raymond James. Pennell Decl. ¶¶ 3, 5; *see also* Pls.' Mem. of Law in Supp. of Their Mot. for a Prelim Inj. 1–2 [hereinafter Mot.].

To assist Turnberry in deciding whether to purchase certificates in the Trust, Raymond James provided significant information and advice to Turnberry. According to Turnberry:

> Raymond James personnel transmitted, among other things, various Sun-Trust materials regarding the investment, including but not limited to the May remittance report for the trust, the SunTrust term sheet and preliminary prospectus, and summary materials describing the underlying mortgage loans. There were also oral communications between Raymond James representatives and [an executive of Turnberry] regarding the nature of the proposed investment.

Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 4 [hereinafter Opp'n]; *see also* Pennell Decl. ¶ 5. Turnberry argues that it "relied on SunTrust's written representations (as well as both written and oral representations by Raymond James) regarding the nature and quality of the underlying mortgage loans." Opp'n 5. Many of these representations allegedly "proved to be materially false and misleading," and the alleged deception by STRH and Raymond James "was compounded by material omissions regarding the rapid deterioration of the underlying loans." *Id.*

In the second week of June, Turnberry informed Raymond James that it needed a copy of the Trust's Pooling and Servicing Agreement (the "PSA"), which established the terms and conditions of payments to certificate holders. Pennell Decl. ¶ 6. Raymond James informed Turnberry that SunTrust would not release the PSA to Turnberry until Turnberry signed a nondisclosure agreement (the "NDA"), and on June 13, 2007, forwarded to Turnberry an email it had received from SunTrust that attached a form NDA and advised Raymond James to "have your client send the agreement to [SunTrust]." Email from Mike Ward to Phil Pennell (June 13, 2007), Ex. A, Pennell Decl.; *see also* Pennell

---

**3.** Although SunTrust Banks is a named plaintiff here, defendants have conceded that they may not compel it to arbitrate before FINRA. *See* Defs.' Opp'n to Pls.' Mot. for Prelim. Inj.

8–9; *see also* Kane Decl. ¶ 3 ("SunTrust Banks, Inc. is not a broker-dealer and is not registered as such with the [SEC] and has never been a [FINRA] member.").

Decl. ¶ 6. An executive of Turnberry signed the NDA and sent it to SunTrust, and on June 15, 2007, SunTrust sent Turnberry a fully executed copy of the NDA as well as the requested PSA. Email from Zenna Wadawu to Phil Pennell (June 15, 2007), Ex. B, Pennell Decl.; *see also* Pennell Decl. ¶ 7.

The form NDA signed by Turnberry and SunTrust contains language evidencing that it was drafted in anticipation of a sale of certificates by SunTrust to the counterparty. *See, e.g.,* Nondisclosure Agreement, Ex. B, Pennell Decl., at 1 ("You have asked that we provide you certain proprietary materials concerning a data file (the 'Data File') that we have been discussing with you in connection with the potential sale by us (the 'Proposed Sale') of certain securities."); *id.* at 2 ("Unless and until a definitive agreement has been executed and delivered between you and us relating to the Proposed Sale, ... neither you nor we will be under any obligation to enter into the Proposed Sale...."). Importantly, though, the NDA does not itself effect a sale of securities. Additionally, it includes language suggesting that the content of the PSA was not being provided as investment advice. *See id.* at 2 ("The Proprietary Information is provided to you solely for the purpose of your evaluation of the Proposed Sale. We make no representation or warranty, express or implied, to you or to any person as to the content of the Proprietary Information. We shall have no liability of any kind to you or to any person to whom you provided Proprietary Information arising from the use thereof.").

## B. Turnberry's Purchase

On June 20, 2007, Raymond James purchased two Trust certificates, together worth over $16 million, from SunTrust. *See* Ex. 2, O'Brien Decl.; *see also* Tr. 8. Eight classes of certificates in the Trust were available, including "one senior tranche (Class A) and four mezzanine tranches (Classes M–1 through M–4, in decreasing seniority)," and Raymond James purchased one certificate in the M–2 tranche and one in the M–4 tranche. SOC ¶ 8. Raymond James allegedly executed this purchase after receiving authorization from Turnberry. Pennell Decl. ¶ 9. The same day, Raymond James sold the two certificates to Turnberry. *See* Ex. 3, O'Brien Decl. The SunTrust–Raymond James transaction and the Raymond James–Turnberry transaction both settled on June 25, 2007. *See* Ex. 2, Ex. 3, O'Brien Decl. Turnberry paid Raymond James a fee for its services, in the form of a differential between the price for the certificates paid by Raymond James and the price paid by Turnberry. *See* Tr. 21–22.

According to Turnberry, "the certificates were earmarked by SunTrust and Raymond James for sale to Turnberry," and "if Raymond James incurred any risk of loss for the securities, it was fleeting at most, since both transactions cleared the same day." Opp'n 7. Although SunTrust concedes that "Turnberry purchased from Raymond James the same certificates that STRH sold to Raymond James," it notes that its records reveal "no reference to [Turnberry] as a current or former brokerage customer of STRH, no brokerage or other customer agreement entered into between STRH and [Turnberry] or that STRH has ever provided any goods, services or advice to [Turnberry] for compensation." Stathis Decl. ¶¶ 9–10.

## C. Events Following Turnberry's Purchase

Following its purchase of the Trust certificates, and "as [its] losses [on its investment in the Trust] mounted," Turnberry sent several emails to SunTrust in an attempt to access documents relating to the

mortgages on which the Trust was based. Pennell Decl. ¶ 10. The first such email was on October 9, 2007, and SunTrust responded by stating that although it would "reasonably cooperate" with requests by Turnberry, "[t]he Trust owns the loans and the loan files," Email from Tony Atkins to Phil Pennell (Oct. 9, 2007), Ex. C., Pennell Decl., and Turnberry should contact the Master Servicers and Securities Administrator, Wells Fargo Bank, N.A., and the Trustee, HSBC Bank USA, National Association, for assistance, *see* Email from Tony Atkins to Phil Pennell (Oct. 12, 2007), Ex. C, Pennell Decl. Apparently, "[n]othing came of this approach, however, despite [Turnberry's] efforts." Pennell Decl. ¶ 11.

Having failed to obtain access to the loan files, Turnberry emailed SunTrust again later that month. *Id.* ¶ 12. This time, SunTrust allegedly instructed Turnberry to contact the Trust's Servicer and Interim Seller, GMAC Mortgage. *Id.* GMAC Mortgage allegedly refused to release loan documentation to Turnberry until SunTrust authorized such release. *Id.* SunTrust's employee responded:

> I (SunTrust) don't have the legal authority to advise GMAC on matters such as this. We are no longer the owner of the mortgage loans and we cannot direct GMAC (Servicer), Wells Fargo (Master Servicer) or HSBC (Trustee) with matters regarding these mortgage loans. Everything has to be done in accordance with the terms of the securitization documents. I can provide you with the name and numbers of the individuals I have at these firms for direction. Let me know if that's something you would like for me to do.

Email from Tony Atkins to Phil Pennell (Nov. 13, 2007), Ex. D, Pennell Decl. Following these email exchanges, "Turnberry had no further communications with Sun-

Trust" and "was never able to obtain loan files or other documentation pertaining to its investment." Pennell Decl. ¶ 13.

## III. Discussion

### A. Legal Standard

Under Second Circuit precedent, a permanent injunction is warranted where the moving party establishes: "(1) success on the merits; (2) the lack of an adequate remedy at law; and (3) irreparable harm if relief is not granted." *UBS Sec., LLC v. Voegeli*, 405 Fed.Appx. 550, 551 (2d Cir. 2011) (citing *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir.2006)). In the context of a motion to enjoin arbitration, the Circuit has held that "[b]eing forced to arbitrate a claim one did not agree to arbitrate constitutes an irreparable harm for which there is no adequate remedy at law." *Id.* at 552 (citing *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003)); *see also* Opp'n 9 (conceding that if STRH prevails on the merits, it will also have demonstrated irreparable harm). Therefore, the only issue is whether STRH succeeds on the merits of its claim.

### B. Analysis

#### 1. The FINRA Code

FINRA Rule 12200 requires parties to arbitrate before FINRA if:

- Arbitration under the [FINRA] Code is either:

  (1) Required by a written agreement, or

  (2) Requested by the customer;

- The dispute is between a customer and a member or associated person of a member; and

- The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activi-

ties of a member that is also an insurance company.

FINRA Rule 12200. The Second Circuit has held that "[t]he interpretation of the arbitration rules of an industry self-regulatory organization (or 'SRO') such as FINRA is similar to contract interpretation." *Wachovia Bank, Nat. Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir.2011). In general, therefore, the terms of the FINRA Code "should be construed in a manner consistent with the 'reasonable expectations' of FINRA members," *id.* (quoting *Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 820 (11th Cir.1993)). However, one difference between ordinary contract interpretation and interpretation of the FINRA Code is that, consistent with the federal policy favoring arbitration, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* (quoting *Bensadoun v. Jobe–Riat*, 316 F.3d 171, 176 (2d Cir.2003)) (internal quotation marks omitted).

Here, there is no dispute that plaintiff STRH is a FINRA member and that the present dispute arises in connection with its business activities. *See* Mot. 6.[4] Additionally, the parties agree that there was no written agreement between STRH and Turnberry that required arbitration. *See* Opp'n 9. The sole basis on which Turnberry seeks to compel STRH to arbitrate is that Turnberry was allegedly STRH's "customer" for purposes of FINRA Rule 12200. Whether Turnberry is correct is the only issue before us.

### 2. Turnberry Was Not a "Customer" of STRH

#### a. Law

■ The FINRA Code's definition of "customer" is simply that "[a] customer

shall not include a broker or dealer." FINRA Rule 12100(i). However, courts have held that the term "customer" must have a more limited meaning than simply "all entities other than brokers or dealers." *See UBS Sec. LLC v. Voegeli*, 684 F.Supp.2d 351, 356 (S.D.N.Y.2010) ("Such an interpretation of FINRA Rule 12100 would be absurd."). Although the Second Circuit "ha[s] avoided offering an exhaustive definition of the term ['customer']," it has held that "[t]he term 'customer' includes at least a non-broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member." *UBS Fin. Servs., Inc. v. W.Va. Univ. Hosps., Inc.*, 660 F.3d 643, 650 (2d Cir. 2011).

Two recent Second Circuit decisions illustrate when a customer relationship exists. First, in *UBS Financial Services, Inc. v. West Virginia University Hospitals, Inc.*, 660 F.3d 643, defendant issued bonds structured as auction-rate securities at the recommendation of plaintiff. *Id.* at 645. Plaintiff also served as the lead underwriter for the offerings and the main broker-dealer responsible for facilitating the auctions at which defendant's bonds were resold and their interest rates set. *Id.* at 646. The broker-dealer contracts between the parties provided: "[T]he fee for the [auction rate certificates] shall be paid by [defendant] and represents compensation for the services of [the] Broker–Dealer [plaintiff] in facilitating Auctions for the benefit of the beneficial owners of the [auction rate certificates]." *Id.* Further, testimony had established that "[plaintiff] advised [defendant] on the appropriate bond-issuance structure, facilitated the auctions at which the bonds' interest rates were set, and 'performed various other tasks as [defendant]'s advis-

---

4. By contrast, as discussed above, Turnberry has conceded that SunTrust Banks is not a

FINRA member and thus may not be compelled to arbitrate. Opp'n 8.

or, partner, agent, and fiduciary' in connection with the issuances." *Id.* at 647. The Second Circuit held that "[defendant] was [plaintiff]'s customer because [defendant] purchased a service, specifically auction services, from [plaintiff]." *Id.* at 650.

In *Wachovia Bank, National Association v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164 (2d Cir.2011), plaintiff and defendant had entered into a credit default swap agreement, wherein plaintiff would pay defendant fixed sums over the term of the agreement and defendant would make payments to plaintiff upon the occurrence of certain conditions, such as a specified default. *Id.* at 167. One of the contracts by which the parties carried out the transaction provided:

> [Each party] acknowledges that the other party acts only at arm's length and is not its agent, broker, advisor or fiduciary in any respect, and any agency, brokerage, advisory or fiduciary services that the other party (or any of its affiliates) may otherwise provide to the party (or to any of its affiliates) excludes the Relevant Agreement, ... [and that] it has not relied and will not be relying upon any evaluation or advice ... from the other party, its affiliates or the representatives or advisors of the other party or its affiliates (except representations expressly made in the Relevant Agreement or an opinion of counsel required thereunder).

*Id.* at 168. Based on this contract, and testimony to the same effect, the Second Circuit concluded that defendant was not plaintiff's customer. *Id.* at 174.

### b. Application

Under FINRA Rule 12200, as interpreted by the Second Circuit, Turnberry was not SunTrust's[5] customer. The entity that provided Turnberry with investment services and sold it the Trust certificates was Raymond James, not SunTrust, and Turnberry did not receive any other goods or services from SunTrust that would indicate a customer relationship. Moreover, as discussed below, although Turnberry invokes four sets of facts in support of its argument that it was SunTrust's customer, none of these facts suggests a customer relationship.

#### i. Documents Prepared by SunTrust and Provided by Raymond James

█ First, Turnberry notes that it relied on documents prepared by SunTrust and provided to it by Raymond James. Opp'n 1; *see also* Tr. 13 (acknowledging that the documents were provided by Raymond James). On face, this fact does not seem to evidence a customer relationship between SunTrust and Turnberry. SunTrust never provided investment services to Turnberry; rather, Raymond James provided such services using information prepared by SunTrust. The mere fact that Turnberry consulted materials prepared by SunTrust does not entail that Turnberry received investment advice from SunTrust, nor does it evidence any other direct relationship sufficient to make Turnberry SunTrust's "customer."

This conclusion is supported by *UBS Securities LLC v. Voegeli*, 684 F.Supp.2d 351 (S.D.N.Y.2010). In that case, plaintiff was the underwriter for a company's IPO and prepared a presentation regarding the IPO for the company's board of directors. *Id.* at 352. Defendants were investors in the company who did not sit on its board, and they received a copy of the

---

**5.** For the remainder of the discussion, we will refer to STRH, the only relevant plaintiff at this point, as "SunTrust."

presentation from the board's chairman. *Id.* Despite the fact that the investors had received, and presumably relied on, information prepared by the underwriter, the Court ruled that the investors were not customers of the underwriter. *Id.* at 356.

Although Turnberry argues that *Twenty–First Securities Corp. v. Crawford,* No. 11 Civ. 6406(WHP), 2011 WL 6326128 (S.D.N.Y. Dec. 15, 2011), *aff'd,* 502 Fed. Appx. 64 (2d Cir.2012), is the "most relevant" case in support of its position, Opp'n 10, *Crawford* is distinguishable. In that case, an investment services firm, in response to a request for advice by an investor, sent the investor materials about a fund which were prepared by the fund's sponsor. *Id.* at *1. The investor then invested in the fund through a third-party firm. *Id.* Although the investment services firm that had advised the investor did not receive a fee directly from the investor, it received a solicitation fee from the fund's sponsor. *Id.* The Court held that the investor was the investment services firm's customer because that firm had provided advice to the investor and received compensation (from the fund sponsor) in connection with that advice. *Id.* at *2. Here, by contrast, SunTrust did not provide advice to Turnberry,[6] nor, of course, did it receive compensation in connection with any such advice.

Turnberry also cites *UBS Financial Services, Inc. v. West Virginia University Hospitals, Inc.,* 660 F.3d 643 (2d Cir.2011), but that case is distinguishable for the same reason that *Crawford* is. As discussed above, the Second Circuit held in *UBS* that "[defendant] was [plaintiff]'s customer because [defendant] purchased a service, specifically auction services, from [plaintiff]." *Id.* at 650. Here, by contrast, Turnberry *did not receive any service*

from SunTrust. The investment and brokerage services Turnberry received were provided by Raymond James, a party against whom Turnberry will arbitrate before FINRA regardless of our decision here.

■ Moreover, even if, as Turnberry argues, "it was reasonably foreseeable ... that the investment-related documents SunTrust supplied to Raymond James would induce customers such as Turnberry to invest," Opp'n 14, Turnberry has not demonstrated that this fact supports a customer relationship. Although foreseeable reliance might have been an important part of our analysis if we were deciding the merits of the fraud claims asserted by Turnberry in the FINRA arbitration, those claims are not before us. Rather, the question presented is simply whether Turnberry was a customer of SunTrust. A customer relationship requires some substantial relationship between the parties, and such a relationship is not present here.

### ii. The Nondisclosure Agreement and the Pooling and Servicing Agreement

■ Second, Turnberry focuses on the fact that it signed a nondisclosure agreement with SunTrust prior to receiving the Trust's Pooling and Servicing Agreement. Opp'n 2. As discussed above, the nondisclosure agreement was apparently drafted in anticipation of a sale of securities by SunTrust to an investor and employed language consistent with that expectation. However, also as discussed above, although the nondisclosure agreement might have anticipated a sale of securities by SunTrust, it did not itself effect any such sale. Moreover, it provided:

---

**6.** As discussed below, the PSA that SunTrust provided to Turnberry following Turnberry's

execution of the nondisclosure agreement did not constitute advice.

The Proprietary Information is provided to you solely for the purpose of your evaluation of the Proposed Sale. We make no representation or warranty, express or implied, to you or to any person as to the content of the Proprietary Information. We shall have no liability of any kind to you or to any person to whom you provided Proprietary Information arising from the use thereof.

Nondisclosure Agreement, Ex. B, Pennell Decl., at 2. Although Turnberry has questioned whether these terms would be sufficient to shield SunTrust from legal liability for its alleged misrepresentations, *see* Tr. 11–12, that issue is one we need not reach. It suffices for our purposes that, as the terms indicate, the PSA was not being provided as financial advice from SunTrust to Turnberry. Of course, a customer relationship could theoretically be based on the purchase of goods or services other than advice, but no such purchase is present here.

### iii. The "Economic Reality" of Raymond James's Role

Third, Turnberry argues that we should ignore Raymond James's brokerage role because "the economic reality is that [Raymond James] was merely a conduit." Opp'n 2. According to Turnberry, "this was a pure example of 'riskless trading' by Raymond James, and the real parties to the transaction were SunTrust and Turnberry, as all three entities well knew." *Id.* As defendants reiterated at oral argument: "[Plaintiffs] were keenly aware that [defendants] were ultimately the recipient of these certificates, . . . and the transaction by which [defendants] received those two certificates was simply a pass through." Tr. 4.

The single case cited by Turnberry in support of its "economic reality" argument is *Lehman Brothers, Inc. v. Certified Re-porting Co.,* 939 F.Supp. 1333 (N.D.Ill. 1996). In *Lehman,* the plaintiff was the "primary market maker" for the stock of a third-party company and allegedly "engage[d] in conduct designed to artificially support and manipulate the stock price." *Id.* at 1335. Although defendants purchased stock from brokers other than plaintiff, they argued that they relied on plaintiff's misrepresentations. *Id.* at 1336. Applying the arbitration provision in the rules of the New York Stock Exchange ("NYSE"), which is similar to that in the FINRA Code, the Court found that defendants were plaintiff's customers. *Id.* at 1340–41. The Court reasoned that defendants "clearly had some kind of relationship with [plaintiff] at the time its employees were providing them with false and misleading information." *Id.* at 1340.

Although the facts of *Lehman* are similar in certain respects to the facts here, *Lehman* is not controlling and, moreover, distinguishable. First, *Lehman* is not controlling: it is a sixteen-year-old decision of a district court outside this Circuit which considered the rules of the NYSE, not FINRA. Second, *Lehman* is distinguishable, as its holding that defendants were plaintiff's customers relied on its finding that there was "some kind of relationship" between them. Indeed, it appears that the *Lehman* plaintiff's involvement in the defendants' investment decision was deeper than simply providing background materials. *See, e.g., id.* at 1335 ("The [plaintiff] also allegedly directed one of its employees . . . to solicit Investors to buy [the third-party company's] stock using a sales script containing false and misleading statements. [The employee] misrepresented to Investors both the stock's value and its investment risk, claiming that [the third-party company] was and would remain profitable."). Here, by contrast, Sun-Trust's role was limited to providing documentation to Raymond James for Ray-

mond James's use in the course of advising Turnberry or to Turnberry in response to Turnberry's request. Turnberry did not have any direct relationship with Sun-Trust.

Moreover, it is notable that the *Lehman* Court explicitly relied on "the federal mandate to resolve all doubts in favor of arbitration" and its judgment that "[t]o allow [the plaintiff] to solicit Investors using allegedly bad market information without repercussion defeats the NYSE's goals of 'maintain[ing] high standards of commercial honor and integrity among its members.'" *Id.* at 1340–41. Here, Turnberry urges us to rely on similar policy considerations to find that it was SunTrust's customer. *See, e.g.,* Tr. 3. However, even granting that these considerations required the *Lehman* Court to find a customer relationship in that case, they do not mandate such a finding here. For one, Turnberry was not solicited and advised by SunTrust, but rather by Raymond James, thus there is less need to hold SunTrust accountable than there was to hold accountable the plaintiff in *Lehman.* More broadly, finding that Turnberry was not SunTrust's customer does not deprive Turnberry of a remedy. Turnberry's claims against SunTrust may still be pursued through normal litigation. Additionally, Turnberry may avail itself of the efficiencies of arbitration by continuing its FINRA proceeding against Raymond James. In short, the considerations leading the *Lehman* Court to find a customer relationship do not require that conclusion here.

■ Even if we were to adopt Turnberry's "economic reality" approach, it is not clear that such an approach would support finding a customer relationship. Focusing on "economic reality," we might ignore the involvement of a broker if the broker played only a nominal role, possibly in an attempt to shield the underwriter from liability. However, Raymond James did not play such a role. To the contrary, Raymond James had a preexisting brokerage relationship with Turnberry, initiated the sequence of interactions leading up to the purchase of certificates, furnished significant brokerage services to Turnberry prior to the transaction date, and received a fee from Turnberry for its services. Further, it is notable that SunTrust sold a significant portion of the available certificates itself in the initial offering, making available through brokers only those certificates that remained. SunTrust, that is, did not consistently seek to shield itself from liability by using brokers, but rather turned to brokers to sell certificates that it was not able to sell itself. In light of these considerations, and in the absence of authority to the contrary, we are disinclined to ignore the actual transactional record in this case.

Our conclusion is supported by other decisions which have held that where an investor purchases a security from a broker rather than directly from the underwriter or issuer of the security, the investor is not a customer of the underwriter or issuer. In *Virchow Krause Capital, LLC v. North,* No. 11 C 8169, 2012 WL 1952731 (N.D.Ill. May 30, 2012), the Court held that an investor was not a customer of the underwriter of the purchased securities where the investor purchased the securities through a third-party broker and did not have a relationship with the underwriter before or at the time of the investment. *Id.* Similarly, in *Morgan Keegan & Co. v. McPoland,* 829 F.Supp.2d 1031 (W.D.Wash.2011), the Court found that investors were not customers of the issuer, reasoning:

A customer has a direct relationship with a firm. [The investors] bought shares in the fund from third-party bro-

kers on the secondary market. Their information was from the street. They never gave money to [the issuer]. They never contacted [the issuer] for advice. They had no direct relationship with [the issuer].

*Id.* at 1035 (quoting *Morgan Keegan & Co. v. Garrett,* 816 F.Supp.2d 439, 441 (S.D.Tex.2011)). Although it is true that here, Turnberry contacted and received information from SunTrust prior to purchasing the certificates, these facts are insufficient to distinguish *Morgan Keegan.* Turnberry never sought or received advice or services from SunTrust; more broadly, Turnberry's direct relationship was with Raymond James, not with SunTrust. Therefore, as in *Morgan Keegan,* there is no customer relationship here.

### iv. Post–Transaction Interaction Between SunTrust and Turnberry

█ Fourth, Turnberry cites the fact that, after the transactions, "Turnberry and SunTrust personnel exchanged emails on a first-name basis ... for over a month." Opp'n 2–3. These exchanges, according to Turnberry, "reflect the extent to which Turnberry considered itself a customer of SunTrust." *Id.* at 3. However, to whatever extent these post-transaction communications are probative of Turnberry's relationship with SunTrust at the time of Turnberry's purchase of the certificates, they do not indicate a customer relationship. Turnberry asked SunTrust for assistance because, as it explains, "it knew [SunTrust] to be familiar with the underlying mortgage loans." *Id.* at 7. Nothing in SunTrust's responses to Turnberry's communications suggests that Turnberry was SunTrust's customer; indeed, SunTrust repeatedly referred Turnberry to third parties rather than helping Turnberry itself. In short, none of the four sets of facts invoked by Turnberry demonstrate that it was SunTrust's customer.

### IV. Conclusion

For the reasons stated above, Turnberry was not SunTrust's customer for purposes of FINRA Rule 12200 and therefore may not compel SunTrust to arbitrate before FINRA. As discussed above, moreover, with the consent of the parties, we consolidated the hearing on plaintiffs' motion for a preliminary injunction with a resolution of this case on the merits pursuant to Rule 65(a)(2). Accordingly, we hereby issue a permanent injunction enjoining defendants from pursuing the FINRA arbitration in dispute against plaintiffs. The Clerk of the Court shall close the case.

**SO ORDERED.**