Citigroup Global Markets Inc. v. Abbar

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

August Term, 2013

(Argued: May 16, 2014     Decided: August 1, 2014)

Docket No. 13-2172

- - - - - - - - - - - - - - - - - -x

CITIGROUP GLOBAL MARKETS INC.,

Plaintiff-Counter-
Defendant-Appellee,

- v.-

GHAZI ABDULLAH ABBAR, as temporary
administrator of the estate of Abdullah Mahmoud
Abbar, shall be substituted for Decedent, AJIAL
LEVERAGED FEEDER HOLDINGS LIMITED,
AMATRA LEVERAGED FEEDER HOLDINGS,
LIMITED, AMAVEST HOLDINGS LIMITED, GAMA
INVESTMENT HOLDINGS LIMITED, CHRISTINE
WOODHOUSE, as temporary administrator of the
estate of Abdullah Mahmoud Abbar, shall be
substituted for Decedent,

Defendants-Counter-
Claimants-Appellants,

ABDULLAH MAHMOUD ABBAR,

Defendant-Counter-
Claimant.*

- - - - - - - - - - - - - - - - - - -x

Before:          JACOBS, CABRANES, and LIVINGSTON,
                 Circuit Judges.

Ghazi Abbar appeals from a judgment of the United States District Court

for the Southern District of New York (Stanton, J.), permanently enjoining FINRA

arbitration against a New York subsidiary of Citigroup, Inc.  In the absence of an

agreement to arbitrate, FINRA arbitration is available only to customers of

FINRA members.  Abbar held his investments with a foreign Citigroup entity; he

purchased no goods or services from the New York subsidiary; he is therefore

not a customer of the New York entity and cannot compel FINRA arbitration

against it.  We affirm.

WILLIAM B. ADAMS, Quinn Emanuel
Urquhart & Sullivan, LLP, New York, New
York (Cleland B. Welton II, Quinn Emanuel
Urquhart & Sullivan, LLP, New York, New
York; John G. Rich, Ross B. Intelisano, Rich,
Intelisano & Katz, LLP, New York, New
York, on the brief), for Appellants.

* The Clerk of Court is directed to amend the caption to conform with the
above.

SCOTT A. EDELMAN (Daniel M. Perry, Jed M. Schwartz, Katherine Rhodes Janofsky, on the brief), Milbank, Tweed, Hadley & McCloy LLP, New York, New York, for Appellees.

Jenice Malecki, Malecki Law, New York, New York, for amicus curiae Public Investors Arbitration Bar Association.

Brent J. McIntosh, Sullivan & Cromwell LLP, Washington, DC, for amicus curiae Securities Industry and Financial Markets Association.

DENNIS JACOBS, Circuit Judge:

Ghazi Abbar, a Saudi businessman who managed Abbar family trusts, lost $383 million invested with a United Kingdom affiliate of Citigroup, Inc.  He seeks to arbitrate his grievances under the rules of the Financial Industry Regulatory Authority ("FINRA") against a New York affiliate, which is a FINRA member.  The United States District Court for the Southern District of New York (Stanton, J.) permanently enjoined the arbitration on the ground that Abbar is not a "customer" of the New York affiliate.

The Abbar family trusts were administered through two wholly-owned investment vehicles (defendants Amatra Leveraged Feeder Holdings, Limited

and Ajial Leveraged Feeder Holdings, Limited) that held the family portfolio. Abbar pursued a risky leveraged investment by purchasing options from Citigroup Global Markets Ltd. ("Citi UK"), which is incorporated in the United Kingdom under the laws of England and Wales. The options entitled Abbar to the value of certain assets in a fund held by Citi UK. Some of the investment bankers who helped develop Abbar's trading strategy, and some of the personnel who worked on the investments, were employed at another Citigroup affiliate, Citigroup Global Markets Inc. ("Citi NY"), which is incorporated under the laws of New York. When the investments lost all value, Abbar commenced a FINRA arbitration in New York against Citi NY, a FINRA member.

Citi NY brought an action in the Southern District of New York to enjoin the arbitration, citing the FINRA Code of Arbitration Procedure for Customer Disputes ("FINRA Code"), which provides that a FINRA member consents to arbitration with its customers. After a bench trial, the district court ruled that Abbar, who purchased no goods or services from Citi NY and had no account with it, therefore lacked the indicia of a customer. Accordingly, the injunction was issued. We affirm.

4

# BACKGROUND

The following facts are drawn from the district court opinion and the undisputed portions of the parties' pleadings and filings.

In late 2005 to early 2006, Ghazi Abbar's private banker, Mohanned Noor, left Deutsche Bank and joined Citigroup Private Bank in Geneva, bringing with him the business of the Abbar family. In the following months, Abbar family trusts (through the defendant investment vehicles) purchased complex options in London from Citi UK.

The structure of the option transactions was as follows (with some blessed simplification). Citi UK set up two "reference funds" to hold the investment assets. Abbar contributed $198 million[1] to the reference funds and Citi UK agreed to contribute between $300 and $900 million in "leverage" funds.[2] Citi UK held ownership of all the assets in the reference funds, including Abbar's contribution. In exchange for Abbar's contribution and certain fees, Citi UK

---

[1] Abbar contributed $343 million in assets encumbered by $145 million in debt, a net contribution of $198 million.

[2] The exact amount of leverage contributed by Citi UK would vary based on the risk level of each individual investment selected by Abbar. The total leverage that could be provided was capped at $900 million.

issued options to the Abbar family trusts that entitled them to the value of the assets held in the reference funds, less the leverage funds. Under this arrangement, the Abbar family trusts were allowed to keep 100 percent of any upside, but had to bear the first $198 million in losses. If the reference funds lost more than the $198 million, the additional loss was borne by Citi UK.[3]

While Citi UK owned the reference funds, they were managed by Abbar with oversight from New York by Citi NY. Abbar served as the Investment Advisor and selected the funds' investments, subject to review and approval by Citi NY. The voting rights in the reference funds were held by Citi NY, which retained the right to remove Abbar as Investment Advisor (and eventually did).

The work of structuring and negotiating the options was done mainly by Citi NY personnel working in a Citigroup division known as the "Hybrids Group." Such "fund derivatives" were within that division's area of specialty, whereas London traders at Citi UK typically arranged investments in different financial products.

---

[3] Abbar paid an interest charge to Citi UK on any leverage funds extended to the reference funds. In this sense, although Citi UK retained economic ownership of the reference funds, the leverage funds are comparable to a non-recourse loan to Abbar. If the value of this loan was impaired, the risk was borne by Citi UK, the lender.

Providing expertise to Citigroup colleagues elsewhere was routine for Citi NY personnel. The arrangement was desired by Abbar, who wanted his private banker Noor "to be able to walk the corridors of the entire Citigroup," and have "access to the entirety of Citigroup"--"wherever the best people were." Citigroup Global Mkts., Inc. v. Abbar, 943 F. Supp. 2d 404, 406 (S.D.N.Y. 2013) ("CGMI v. Abbar"). Abbar had frequent communication with the personnel at Citi NY, paid little attention to which Citigroup entity employed the people he was working with, and interacted with employees of Citigroup divisions and offices in Geneva as well as in London and New York.

Under the two option agreements (one with each of the defendant investment vehicles), the Citigroup counterparty to the option transactions was Citi UK. The terms of the options were set forth in confirmations between Citi UK and Abbar's investment vehicles. The transactions were recorded on Citi UK's books of account.

The option agreements themselves included no forum selection or choice-of-law clause, but Citi UK and Abbar entered into an additional agreement that did. Two structuring-services letters contained Abbar's agreement to pay Citi UK for setting up the investment, and these included

7

forum-selection and choice-of-law clauses providing that "any disputes which may arise out of or in connection with this letter agreement" would be adjudicated in English courts under English law.

After the transactions closed in May 2006, Citi NY personnel continued to monitor the risk to Citi UK and helped prepare monthly reports on the status of the funds. Citi NY performed due diligence on hedge-fund assets to assess Citi UK's leverage and exposure. As holder of the funds' voting rights, Citi NY had final say over investment decisions. These services were performed by Citi NY more for the benefit of Citi UK than for Abbar. The setup allowed Citi NY to override Abbar's decisions as Investment Advisor and, in that way, protect Citi UK's very considerable interest.

The interrelationship between Citi UK and Citi NY was set out in internal Citigroup documents, and was formalized in powers of attorney, including one that granted Citi NY authority to sign the transaction confirmations for Citi UK. Accounting adjustments reflected the value of services each affiliate performed for the other.

The option transactions came under stress in 2008. Citi NY removed Abbar as Investment Advisor early in 2009. In the fall of 2009, Citi NY

employees participated in workout efforts with Abbar. Those efforts failed, and Abbar lost his entire investment.

Abbar filed a statement of claim with FINRA in August 2011 on behalf of himself, his father (Abdullah Mahmoud Abbar), and their investment vehicles. He requested arbitration against Citi NY.

The statement of claim, which alleged losses from the option transactions, also complained of a failed $100 million private equity loan facility extended to Abbar by Citibank Switzerland SA and the Geneva branch of Citibank NA. The March 2007 loan supplied Abbar with funds he needed to meet capital calls on his heavily-leveraged hedge fund investments. Pursuant to the loan agreement, Abbar transferred control of $147 million worth of hedge fund investments to the Swiss Citigroup entities. The financial crisis wiped out the hedge fund investments, and Abbar blamed the losses on the Swiss banks' mismanagement of the funds. Although Citi NY personnel played no role in negotiating the loan, Abbar testified that the loan facility and the option transactions were a "package deal," and that the workout discussions proposed consolidation of the two transactions. Abbar therefore claimed that Citi NY was responsible for the $147 million loss, and sought recovery in the FINRA arbitration.

9

Abbar lost $198 million on the option transactions, $147 million on the private equity loan facility, and an additional $38 million that he injected into these transactions at various points. All told, Abbar lost $383 million.

Citi NY brought this action in the Southern District of New York to enjoin the FINRA arbitration, and named as defendants Abbar, Abbar's father, and their investment vehicles. Because Citi NY had no written arbitration agreement with Abbar, the FINRA rules mandate arbitration only if Abbar is a "customer" of Citi NY. Citi NY argued that Abbar was a customer of Citi UK, but not of Citi NY.

Judge Stanton granted the injunction following almost two years of pre-trial motions and a nine-day trial (with thousands of pages of documents and scores of exhibits admitted in evidence). The opinion explains how this threshold question became so ramified:

> That is because the question whether Mr. Abbar was a "customer" of [Citi NY] was seen to require examining and evaluating the substance, nature, and frequency of each interaction and task performed by the various persons who dealt with Mr. Abbar, their contemporaneous understandings of whose behalf the person was acting [for], and the extent to which the person's activities shaped or caused the transaction, in the hope that such facts would coalesce into a functional concept of the customer relationship capable of supporting a judicial determination.

CGMI v. Abbar, 943 F. Supp. 2d at 407.  Consideration of all this "evidence as a whole" compelled the conclusion that Abbar was not a customer of Citi NY "because of the overwhelming significance of the execution of the transactions with [Citi UK]" and because "the planning, structuring, and other services performed by [Citi NY] in New York were ancillary and collateral to those central core transactions."  Id. at 408.

However, Judge Stanton ultimately relied on a different, more categorical holding:

> However, I do not rest [my] decision on those grounds which require, as they have in this case, such an expenditure of time, expense and effort to establish as to make a mockery of the statutory concept that whether there is an agreement to arbitrate be decided by the court at the outset, and promptly.  There is a better way. . . .
>
> The more direct, available, reliable, and predictable ground for decision is . . . [that] the investor is the customer of the party with which he has the account and consummates the transaction.
>
> The entity in which the investor has his account, and from whom the investor purchases his desired product, defines the legal and business locus of his status as a customer, and is the core of the relationship as a customer.

Id.  The district court noted that this definition of "customer" comports with the ordinary meaning of the term: "one that purchases some commodity or service."

11

Id. at 409 (internal quotation marks omitted) (citing UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 650 (2d Cir. 2011)). That solution, Judge Stanton observed, is both sensible and efficient:

> The elements of an account and a purchase are visible to all at the outset of the dispute resolution process. Their use as a rule of decision allows ready determination of the arbitrability of disputes, and avoids the need for lengthy proceedings over whether arbitration is available. It gives the financial community reasonable expectations with respect to the rule that will apply. That is the ground of decision in this case, and it should be applied in other such cases, with appropriate exceptions to avoid injustice.

Id. at 410.

This appeal followed.


## DISCUSSION

"Following a civil bench trial, we review a district court's findings of fact for clear error, and its conclusions of law de novo; resolutions of mixed questions of fact and law are reviewed de novo to the extent that the alleged error is based on the misunderstanding of a legal standard, and for clear error to the extent that the alleged error is based on a factual determination." Diebold Found., Inc. v. Comm'r, 736 F.3d 172, 182 (2d Cir. 2013).

12

"In the absence of an agreement by the parties to submit the matter of arbitrability to the arbitrator, the question of whether or not a dispute is arbitrable is one for the court." Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171 (2d Cir. 2011). The arbitration rules of an industry self-regulatory organization such as FINRA[4] are interpreted like contract terms; "the organization's arbitration provision 'should thus be interpreted to give effect to the parties' intent as expressed by the plain language of the provision.'" Id. (quoting Bensadoun v. Jobe–Riat, 316 F.3d 171, 176 (2d Cir. 2003)) (internal quotation marks omitted).

The FINRA Code mandates that members submit to FINRA arbitration of a dispute if:

- Arbitration under the Code is either:
  (1) Required by a written agreement, or
  (2) Requested by the customer;

- The dispute is between a *customer* and a member or associated person of a member; and

---

[4] FINRA is a registered self-regulatory organization under the Securities Exchange Act of 1934, see 15 U.S.C. §§ 78c(a)(26), 78s(b), and has the authority to regulate its securities firm members by creating and enforcing rules. See Securities and Exchange Commission Release No. 34–56145, 72 Fed. Reg. 42169, 42170 (Aug. 1, 2007).

13

- The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

FINRA Rule 12200 (emphasis added). In short, the rule requires a FINRA member to arbitrate disputes with its "customers," or the "customers" of its "associated persons" (who are defined as natural persons, see FINRA Rule 12100(r)). Since Citi NY is a FINRA member, see FINRA Rule 12100(o), and there is no written agreement to arbitrate, the decisive issue is whether Abbar was a "customer" of Citi NY. See UBS, 660 F.3d at 648-49 (noting that FINRA members are bound to adhere to the arbitration provisions of the Code).

The FINRA Code does not define "customer," except to say that a "customer shall not include a broker or dealer." FINRA Rule 12100(i). At the outset, we can reject Abbar's contention that, under John Hancock Life Insurance Company v. Wilson, 254 F.3d 48 (2d Cir. 2001), we must resolve any ambiguity in favor of arbitration. This argument has been rejected more than once. See Wachovia, 661 F.3d at 170-71; Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 39 (2d Cir. 2010) ("Citigroup v. VCG"); cf. Bensadoun, 316 F.3d at 176 (classifying John Hancock's suggestion

14

that presumption in favor of arbitration applies as "dicta"). Because the parties here are disputing the existence of an obligation to arbitrate, not the scope of an arbitration clause, the general presumption in favor of arbitration does not apply. See Applied Energetics, Inc. v. NewOak Capital Mkts., LLC, 645 F.3d 522, 526 (2d Cir. 2011) ("While doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made."); see also UBS, 660 F.3d at 663 (Preska, J., dissenting) (citing Applied Energetics to reject application of presumption to definition of "customer" in FINRA Rule 12200). Therefore, the word "customer" must "be construed in a manner consistent with the reasonable expectations of FINRA members." Wachovia, 661 F.3d at 171 (internal quotation marks omitted).

The purchase of a good or service from a FINRA member creates a customer relationship. See UBS, 660 F.3d at 650. When such a purchase is undisputed, "there is no need for further court proceedings" concerning the existence of a customer relationship. Wachovia, 661 F.3d at 173. Likewise, when it is clear that no goods or services were provided by the FINRA member, "there is no need to grapple with the precise boundaries of the FINRA meaning of

'customer'" because "no rational factfinder could infer" a customer relationship on such facts. <u>Wachovia</u>, 661 F.3d at 173-74 (holding that no customer relationship existed where FINRA member provided no "agency, brokerage, advisory or fiduciary services" for opposing party, and no brokerage services agreement existed).

Our case lies in between. Citi NY employees certainly provided services to Abbar: they helped structure and manage the option transactions. However, Abbar did not purchase those services from Citi NY. His investment agreements were with Citi UK, and the fee for all services rendered by Citigroup personnel and offices was paid to Citi UK. Citi UK--not Citi NY--was the counterparty to the option agreements and the structuring services letters. While Abbar was certainly a "customer" of Citi UK, that relationship does not allow Abbar to compel arbitration against its corporate affiliate. <u>See</u> <u>Wachovia</u>, 661 F.3d at 171 (holding that a purchaser of a credit default swap from "Wachovia Bank, N.A." was not a "customer" of affiliate "Wachovia Capital Markets, LLC"). The district court found as fact that when Citi NY provided management services to Abbar, it acted primarily for Citi UK in connection with the services Citi UK was

providing to Abbar. CGMI v. Abbar, 943 F. Supp. 2d at 406-07. That finding of fact is not clear error, and is well supported by the record.

We are thus presented with an issue that, until now, this Court has been able to avoid: the "precise boundaries of the FINRA meaning of 'customer.'" Wachovia, 661 F.3d at 173-74. We hold that a "customer" under FINRA Rule 12200 is one who, while not a broker or dealer, either (1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member.

The ordinary meaning of the word "customer" (no special meaning seems intended) is "someone who buys goods or services." UBS, 660 F.3d at 650 (internal quotation marks omitted) (citing multiple dictionary definitions). By agreeing to accept "a fee for its services" or by selling securities to an entity, a FINRA member understands that it may be compelled to arbitrate if a dispute arises with that entity. Id. This may not be a "comprehensive definition of the term," see id., but it captures virtually all customer relationships.

A customer relationship can also come into being by opening an account with the FINRA member. See Oppenheimer & Co., Inc. v. Neidhardt, 56 F.3d 352, 357 (2d Cir. 1995) (finding that "placing funds with Oppenheimer for investment" created a "customer" relationship under the predecessor rule to

17

FINRA Rule 12200). An account holder has a reasonable expectation to be treated as a customer, whether or not goods or services are purchased directly from the FINRA member. Likewise, the FINRA member should anticipate that account-holders may avail themselves of the arbitration forum to dispute transactions arising from the account. So even if the FINRA member executes all securities transactions through an affiliate or provides services without fee, the account-holder can compel arbitration under Rule 12200.[5]

In most cases, this definition of "customer" can be readily applied to undisputed facts. That is so in this case: Abbar never held an account with the FINRA member and (notwithstanding his argument to the contrary) never purchased any goods or services from it. When it is unclear whether goods or services were in fact purchased from the FINRA member, discovery (and

---

[5] Our conclusion is bolstered by FINRA Regulatory Notice 12-55, which defines the term "customer" as it is used in FINRA's suitability rule to include "a person who is not a broker or dealer who opens a brokerage account at a broker-dealer or purchases a security for which the broker-dealer receives or will receive, directly or indirectly, compensation." FINRA Regulatory Notice 12-55 at Q & A 6(b) (Dec. 2012). While application of Regulatory Notice 12-55 is limited to the suitability context, its recognition that either a purchase *or* account may give rise to a customer relationship further counsels against limiting Rule 12200's use of the term "customer" to those who purchase a good or service from a FINRA member. See UBS, 660 F.3d at 651 (relying on other provisions in the FINRA Code to define "customer" in Rule 12200).

possibly a trial) may be required. See Wachovia, 661 F.3d at 173 (citing Citigroup v. VCG, 598 F.3d at 32-33, 39). But even then, it will not be necessary to make a detailed examination (as the district court felt compelled to do here) of "the substance, nature, and frequency of each interaction and task performed by the various persons . . . , their contemporaneous understandings . . . , and the extent to which the person's activities shaped or caused the transaction." CGMI v. Abbar, 943 F. Supp. 2d at 407.

The only relevant inquiry in assessing the existence of a customer relationship is whether an account was opened or a purchase made; parties and courts need not wonder whether myriad facts will "coalesce into a functional concept of the customer relationship." Id. To the extent and in the event such a bright-line rule allows for evasion and abuse, we think that sufficient relief can be afforded by FINRA's power to discipline its members and adjust its rules, and by Judge Stanton's caveat that exceptions may be compelled in rare instances of injustice. See Oppenheimer, 56 F.3d at 357 (finding customer relationship with FINRA member, despite the claimant's lack of an account with the member, because the claimant would have had an account with the member but for the fraud asserted in the FINRA arbitration); cf. UBS, 660 F.3d at 650 (noting that a

19

customer may also be one who "undertakes to purchase a good or service" from a FINRA member").

As this case illustrates, finance nowadays often involves worldwide sources, networks of information, talent and technology. But multiple inputs do not necessarily create customer relationships in different places simultaneously. The proceedings conducted in this case amount to a controlled experiment in what happens when customer status entails inquiring into each communication, agreement, side agreement, understanding, and rendering of advice, and when big guns are drawn in contentious discovery disputes and at trial. The sprawling litigation that can (and did) result defeats the express goals of arbitration to yield economical and swift outcomes.

A simple, predictable, and suitably broad definition of "customer" is therefore necessary. See UBS Fin. Servs., Inc. v. Carilion Clinic, 706 F.3d 319, 325 (4th Cir. 2013) (defining "customer" as "one, not a broker or dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities . . . ."). True, the definition closes the FINRA forum to some foreign transactions with little connection to the United States. But a foreign business that wants to assure access to FINRA arbitration for its

grievances need only transact business with a FINRA member or hold an account with one.

The judgment of the district court is affirmed.