Matter of LEK Sec. Corp. v Elek (2020 NY Slip Op 01134)





Matter of LEK Sec. Corp. v Elek


2020 NY Slip Op 01134


Decided on February 18, 2020


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on February 18, 2020

Richter, J.P., Gische, Gesmer, Kern, González, JJ.


10763N 653120/19

[*1] In re LEK Securities Corporation, et al., Petitioners-Respondents,
v
Istvan Elek, Respondent-Appellant.


Malecki Law, New York (Jenice L. Malecki of counsel), for appellant.
Tannenbaum Helperin Syracuse & Hirsctritt LLP, New York (Adam M. Felsenstein of counsel), for respondents.



Order, Supreme Court, New York County (Joel M. Cohen, J.), entered on or about June 19, 2019, which granted the petition for a permanent stay of respondent's FINRA arbitration, and denied respondent's cross motion to compel arbitration, reversed, on the law, with costs, the petition denied, and the cross motion granted.
The record establishes that respondent was a customer of nonparty Lek Securities UK, Ltd. (LekUK), where he had his account, and was also a client of petitioner Lek Securities Corp. (LekUS), with which he had a series of direct agreements. Under those agreements, LekUS conditioned its provision of depository and execution services for certain trades on respondent's providing certain representations and an indemnity (see Sinclair & Co. LLC v Pursuit Inv. Mgt. LLC, 74 AD3d 650 [1st Dept 2010]).
Specifically, respondent purchased shares of Cannabis Science, Inc. (CBIS) in a series of transactions in 2015 and 2016 that required that the shares be held and sold in the United States. For each transaction, respondent executed an agreement (Deposit Agreement) directly with LekUS pursuant to which LekUS deposited the shares in its account at the Depository Trust & Clearing Corporation (DTCC). In each Deposit Agreement, (1) respondent represented that his answers to certain questions were true and acknowledged that LekUS would rely on those representations; (2) LekUS agreed to act as the "Processing Broker" to provide the services of depositing and reselling the shares; and (3) LekUS accepted respondent's "Deposit Securities Request" on certain conditions, including that any claims by respondent or disputes arising from respondent's representations in the Deposit Agreement "shall be governed by New York law and subject to the exclusive venue and jurisdiction of the courts and arbitration forums in the City and State of New York," and that respondent would indemnify LekUS in connection with claims arising from respondent's representations in the Deposit Agreement or from "the deposit process or the subsequent sale of the securities."[FN1]
When respondent sought to trade the CBIS shares deposited with LekUS, he communicated with Michael Mainwald, who was located at the office of LekUS, had a LekUS phone number and email address, and was registered with FINRA as the "principal operating [*2]officer" of LekUS.[FN2]
By letter dated December 6, 2018, LekUS notified respondent that it had been sued by FINRA in connection with CBIS transactions and that LekUS sought indemnification by defendant pursuant to the Deposit Agreements. LekUS repeated that claim in an email dated January 16, 2019, again citing to the Deposit Agreements.[FN3]
Under these circumstances, respondent was a "customer" of LekUS within the meaning of FINRA Rule 12200, and was therefore entitled to demand arbitration.
Petitioners and our dissenting colleague cite to Citigroup Global Mkts. Inc. v Abbar (761 F3d 268 [2d Cir 2014]) in asserting that respondent was not a customer of LekUS and may not, therefore engage in FINRA arbitration with LekUS. However, the facts of this case are distinguishable from the facts in Abbar. There, defendants entered into a complex investment vehicle with CitiUK. CitiUK then transferred its voting rights to an affiliate, Citi New York, whose personnel helped structure the transaction, gave investment advice, and performed other tasks related to the investment vehicle pursuant to an agreement between Citi New York and CitiUK. When the fund crashed, defendants sought FINRA arbitration against FINRA member Citi New York. Noting that defendants had investment agreements only with CitiUK, and had no agreements with Citi New York, the Second Circuit found that defendants had neither purchased goods or services from, nor had an account with, Citi New York and thus could not seek FINRA arbitration with Citi New York.
In contrast, here, LekUS performed deposit and resale services for respondent pursuant to the Deposit Agreements between LekUS and respondent. To accomplish this, respondent dealt directly with the principal operating officer of LekUS.
Furthermore, while respondent did not pay fees directly to LekUS, he was charged a minimum of $25,000 in fees each month by LekUK, and LekUK paid LekUS fees to provide services to respondent. Respondent's LekUK statements list securities processing fees for the CBIS transactions processed by LekUS. Moreover, contrary to petitioners' counsel's unsupported claim that fees paid by LekUK to LekUS were not commissions or volume-based, dependent on specific transactions performed by LekUS, respondent's LekUK statements list different fees charged for each CBIS transaction that appear to be volume-based [FN4]. Similarly, the dissent's apparent assumption that fees paid by respondent were merely "pass-through" fees charged by the DTCC to LekUS rather than revenue to LekUS is not supported by the record. Accordingly, respondent did pay fees indirectly to LekUS for the services it rendered to him.
Triad Advisors, Inc. v Siev (60 F Supp 3d 395 [ED NY 2014]) is closely on point. In that case, plaintiff FINRA member's employee referred defendants to a real estate venture investment for which the employee received a referral fee from the venture. When the investment went badly, defendants commenced FINRA arbitration against plaintiff, and plaintiff sought to stay the arbitration. The court denied plaintiff's request, finding that defendants were customers of plaintiff, despite the fact that plaintiff's employee was paid indirectly through a third party rather than directly by defendants. In so holding, the court noted that the source of the compensation is immaterial. "It either comes directly from the customer or indirectly through the third party. . . but in either situation, it is the customer that pays it. . . ." (id. at 398; see also Abbar, 761 F3d 268, n 5 [noting that FINRA Regulatory Notice 12-55 defines "customer" as one who purchases [*3]a security for which the broker-dealer receives compensation "directly or indirectly"]). Applying that reasoning here, we find that respondent purchased services from LekUS, even though LekUS received direct payment for its services from LekUK.
All concur except Kern, J. who dissents in a memorandum as follows:




KERN, J. (dissenting)


The motion court properly stayed the FINRA arbitration. The parties did not have an agreement to arbitrate and respondent was not a customer of LekUS, a FINRA member. Therefore, I respectfully dissent.
Respondent is the former Consul General of Hungary to Monaco and is a resident of Monaco. Petitioner Lek Securities Corporation (LekUS) is a New York-based broker/dealer and member of FINRA. LekUS's parent is nonparty Lek Holdings Limited, which is owned by petitioner Samuel Lek.
In July 2014, respondent opened a securities account with nonparty Lek Securities UK, Ltd. (LekUK), a London-based broker/dealer, registered with and governed by the Financial Services Authority of the United Kingdom. LekUK is also owned by Lek Holdings Limited. Respondent opened this account pursuant to a written customer agreement with LekUK, which provides for jurisdiction of disputes in England and Wales. The agreement also provides that respondent will indemnify LekUK in the event the representations made in the agreement are false and lead to the assertion of claims against LekUK.
In 2015 and 2016, began to trade, through his LekUK securities account, in the shares of a microcap company, Cannabis Sciences, Inc. (CBIS). Respondent's trading involved restricted shares of CBIS. He entered into special liquidating transactions with the original shareholders in order to attempt to comply with the restrictions on the shares. In each instance, he obtained an opinion of counsel that the transaction complied with SEC Rule 144A, regarding the permissible trading in restricted shares.
The CBIS shares transactions in which respondent engaged provided that the shares would be held and liquidated in the United States. Thus, while respondent traded through his LekUK account, LekUK had to deposit the shares in the United States. LekUK deposited the shares with its affiliate, LekUS. LekUS then held and liquidated the shares at respondent's direction. Respondent traded 139,000,000 shares of CBIS in a series of transactions throughout 2015 and 2016. For each transaction, respondent provided LekUS opinion of counsel that the transaction complied with Rule 144A and also entered into a questionnaire/shareholder agreement with LekUS. In each questionnaire/shareholder agreement, respondent made numerous representations about himself and his trading. The questionnaire/shareholder agreements also contained an indemnification provision which stated that, should the statements made by respondent turn out to be false, or if any claim or investigation is brought against LekUS relating to the "deposit process or subsequent sale of the securities," respondent must indemnify LekUS.
LekUS deals with LekUK via a Business Services Agreement (BSA) pursuant to which LekUS maintains a bulk account for all securities held for LekUK, including LekUK customers' securities that are in the United States. The BSA provides that LekUK will indemnify LekUS should any conduct of a LekUK customer cause LekUS to be in violation of the securities laws or regulations. LekUS uses the Depository Trust & Clearing Company (DTCC) to hold the shares. Pursuant to the BSA between LekUK and LekUS, LekUS charged LekUK a fixed fee for its services, which was not based on total volume of services performed and no additional fees were charged by LekUS to LekUK for the specific services provided to respondent. LekUS did not charge respondent fees for the deposit and liquidation services it performed. Respondent was only charged fees by LekUK pursuant to their customer agreement.
In November 2018, FINRA brought suit against LekUS for failure to supervise in relation to a number of transactions related to the stock of CBIS, which included the transactions made by respondent during 2015 and 2016. The allegations in the FINRA action included that LekUS had failed to consider the money laundering aspects of certain types of transactions, had failed to verify compliance with Rule 144A and had failed to check on the relevant holding period on the [*4]restricted shares.
Pursuant to the indemnification provision of the BSA, LekUS asserted a claim against LekUK for indemnification for any fees or losses arising from the FINRA action. In response, pursuant to its customer agreement with respondent, LekUK froze respondent's account, preventing him from withdrawing his funds or securities.
Instead of proceeding under his customer agreement with LekUK and commencing an action against LekUK in England or Wales to challenge its freezing of his account, respondent commenced an arbitration with FINRA against LekUS, Samuel Lek and his son, Charles Lek, as control persons of LekUS. Respondent's statement of claim sought, inter alia, compensatory damages in an amount not less than $500,000 plus punitive damages and attorney's fees on the theory that LekUS improperly froze and deducted fees from respondent's account.
Thereafter, petitioners commenced this proceeding, pursuant to CPLR 7503(b) and the Federal Arbitration Act (9 USC § 1 et seq.), seeking to stay the FINRA arbitration, and respondent cross-petitioned to compel arbitration. The motion court granted petitioners' motion to stay the arbitration and denied respondent's cross motion to compel arbitration on the ground that LekUS could not be compelled to arbitrate because the parties had no agreement to arbitrate and because respondent was not a customer of LekUS. I agree and would affirm the motion court's order.
Pursuant to the FINRA Code, FINRA members must submit to arbitration of a dispute if arbitration under the Code is either required by a written agreement or requested by the customer, the dispute is between a customer and a member or associated person of a member and the dispute arises in connection with the business activities of the member or the associated person (see FINRA Rule 12200). Since LekUS is a FINRA member and there is undisputedly no written agreement to arbitrate, LekUS can only be compelled to arbitrate if respondent was a "customer" of LekUS.
The FINRA Code does not define "customer" except to say that a "customer shall not include a broker or dealer" (FINRA Rule 12100[k]). Both LekUS and respondent cite to and apply to the facts of this case the definition of "customer" as set forth by the Second Circuit in Citigroup Global Mkts. Inc. v Abbar, 761 F3d 268 (2d Cir 2014). In Abbar, the Second Circuit held that "a customer' under FINRA Rule 12200 is one who, while not a broker or dealer, either (1) purchases a good or service from a FINRA member, or (2) has an account with a FINRA member" (Abbar, 761 F3d at 275).
Abbar is instructive as it is directly on point with the facts of this case. In Abbar, the defendants entered into a complex investment vehicle with CitiUK. The defendants invested approximately $200 million into the vehicle as a "reference fund" and CitiUK invested approximately $300 million. While CitiUK owned the reference funds, they were managed by defendants with oversight from New York by CitiUK's affiliate, CitiNY. CitiUK also transferred its voting rights to CitiNY. Personnel at CitiNY helped structure the investment transaction, gave investment advice and performed other tasks related to the reference fund and defendants were regularly in contact with the CitiNY personnel who were located in New York. When the fund crashed, the defendants sought FINRA arbitration against CitiNY, a FINRA member. Faced with the question, as we are here, of whether the defendants were "customers" of CitiNY, the district court permanently enjoined the arbitration on the ground that defendants were not customers of CitiNY but rather only customers of CitiUK, where they had their account. The Second Circuit affirmed on the grounds that defendants "never held an account with the FINRA member and (notwithstanding [their] argument to the contrary) never purchased any goods or services from it" (Abbar, 761 F3d at 276). Although the court found that "CitiNY employees certainly provided services to [defendants]..., [they] did not purchase those services from CitiNY. [The] investment agreements were with CitiUK and the fee for all services rendered by Citigroup personnel and offices was paid to CitiUK" (Abbar, 761 F3d at 275).
Applying to the facts of this case the definition of "customer" as set forth in Abbar, I find that respondent was not a customer of LekUS and therefore, LekUS cannot be compelled to arbitrate. Initially, as in Abbar, there is no dispute that respondent did not have an account with LekUS. Respondent opened and maintained an account only with LekUK. Further, as in Abbar, [*5]there is no evidence that respondent purchased goods or services from LekUS, either directly or indirectly. Rather, the record indicates that the deposit and liquidation services performed by LekUS were performed on behalf, and at the behest, of LekUK and that LekUS was compensated for its services only by LekUK pursuant to the BSA. There is no evidence that respondent paid any fees directly to LekUS for the services it provided. There is also no evidence that any of the fees paid by LekUK to LekUS in exchange for providing its services were paid by respondent. Indeed, the record establishes that the fees paid to LekUS by LekUK were paid irrespective of whether the services were used, who used such services or LekUS's trading volume. Further, as the Court held in Abbar, the fact that LekUS and its personnel provided services for respondent at the request of LekUK is not evidence that respondent purchased such services from LekUS.
Respondent is seeking to compel LekUS to arbitrate merely to avoid the jurisdictional requirements of his customer agreement with LekUK that he litigate his disputes in England and Wales. Respondent commenced the arbitration at issue solely to challenge the freezing of his securities account. However, it was LekUK, and not LekUS, which froze respondent's account.
Respondent's assertion that the questionnaire/shareholder agreements he entered into with LekUS are evidence that he purchased services from LekUS, thereby making him a "customer" under the FINRA Code, is unavailing. Before selling unregistered shares for LekUK, LekUS had to conduct a searching inquiry to determine if the shares could be sold pursuant to a valid exemption from registration. To accomplish that goal, LekUS asked respondent to fill out and sign the questionnaire/shareholder agreements, which respondent filled out and signed and returned to LekUK, which, in turn, forwarded the signed questionnaire/shareholder agreements to LekUS. However, the questionnaire/shareholder agreements do not include any terms of purchase of any goods or services and they do not state that respondent is purchasing any goods or services. The agreements provide that "in consideration of [LekUS] accepting this Deposit Securities Request," respondent would, inter alia, indemnify LekUS from any loss or claim arising out of respondent's representations in the questionnaire, the deposit process or the subsequent sale of securities. Notably, LekUS has not asserted any indemnification claim against respondent based on the language in the questionnaire/shareholder agreements. Rather, LekUS only asserted indemnification claims against LekUK arising from the BSA between LekUS and LekUK, to which respondent is not a party.
Respondent's assertion that the "pass-through" fees he was charged by LekUK for trading in CBIS securities are evidence that he purchased services from LekUS, thereby making him a "customer" under the FINRA Code, is also unavailing. The pass-through fees relied upon by respondent were charged to LekUS by the DTCC for holding the securities. LekUS then passed such fees on to LekUK, which in turn, passed them on to respondent. However, such fees do not constitute revenue for LekUS, which did not charge respondent any fees at all. Moreover, these fees are charged to respondent by LekUK in accordance with their customer agreement and they appear on respondent's LekUK account statement.
Respondent's assertion that petitioners are estopped from arguing that he was not a customer is unavailing as he fails to allege, nor could he, that he was fraudulently induced into opening an account with LekUK (see Oppenheimer v Neidhardt, 56 F3d 352, 357 [2d Cir 1995]).
Respondent's contention that the FINRA arbitration should not be stayed on the ground that a stay violates the important public policy favoring arbitration is also without merit. Although the policy favoring arbitration requires that ambiguities as to the scope of arbitrability be resolved in favor of arbitration, the same policy does not apply to determinations of whether there is an agreement to arbitrate in the first instance (see Abbar, 761 F3d at 274).
Based on the foregoing, I respectfully dissent and would affirm the decision of the motion court.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: FEBRUARY 18, 2020
CLERK



Footnotes

Footnote 1:Although these documents were headed "Deposit for Securities Request Questionnaires," they include a list of "Terms and Conditions" which imposed obligations on each party and were thus certainly agreements, and were referred to as such by LekUS.

Footnote 2:Accordingly, petitioners' claim that Mainwald was exclusively an employee of LekUK is not supported by the record.

Footnote 3:Thus, we disagree with our colleague's statement that LekUS did not assert a claim against respondent based on the language in the Deposit Agreements.

Footnote 4:Indeed, petitioners' counsel admitted at oral argument before Supreme Court with regard to fees paid by LekUK to LekUS, "I don't know if it's a flat fee, honestly. . . ."